Joseph P. Cervini, Jr. (JC-6143)
TODTMAN, NACHAMIE, SPIZZ & JOHNS, P.C.
425 Park Avenue
New York, New York 10022
(212) 754-9400
*Attorneys for Plaintiff*
*First Central Savings Bank*

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ AUG 07 2009 ★

**BROOKLYN OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

09 - 3444

Case No.

FIRST CENTRAL SAVINGS BANK,

              Plaintiff,

      -against-

MERIDIAN RESIDENTIAL CAPITAL D/B/A
TRUMP FINANCIAL, DAVID BRECHER,
MERIDIAN MORTGAGE SERVICES, INC., DBS
SERVICING SOLUTIONS, INC., NH APPRAISAL
ASSOCIATES, INC., DAVID S. FRANKEL, P.C.,
MDS APPRAISAL GROUP, LAW OFFICES OF
SAM SHORE, JEFFREY E. MEHL, ESQ., TRUE
VALUATIONS APPRAISERS, ADMOR
APPRAISALS, ATRIUM APPRAISAL SERVICES,
INC., THE ADDISON GROUP, OLD REPUBLIC
NATIONAL TITLE INSURANCE CO., ANDREW
KESLER, and MAK APPRAISALS,

              Defendants.

**COMPLAINT WITH
JURY TRIAL DEMAND**

**IRIZARRY, J.**

**BLOOM, M.J.**

First Central Savings Bank ("First Central" or "Plaintiff"), by and through its

undersigned counsel, as and for its Complaint against defendants, Meridian Residential Capital

d/b/a Trump Financial ("Meridian"), David Brecher ("Brecher"), Meridian Mortgage Services,

Inc. ("MSI"), DBS Servicing Solutions, Inc. ("DBS") (collectively, the "Meridian Defendants"),

NH Appraisal Associates, Inc. ("NH Appraisals"), David S. Frankel, P.C. ("Frankel"), MDS

Appraisal Group ("MDS"), Law Offices of Sam Shore ("Shore"), Jeffrey E. Mehl, Esq.,

("Mehl"), True Valuations Appraisers ("True Valuations"), Admor Appraisals ("Admor"), The Addison Group (the "Addison Group"), Old Republic National Title Insurance Co. ("Old Republic"), Andrew Kesler ("Kesler") and MAK Appraisals ("MAK") (collectively, the "Defendants"), allege as follows:

## INTRODUCTION

1.      This is an action for civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1662(c) and (d), common law fraud, conspiracy to defraud, breach of contract, breach of fiduciary duty, specific performance, unjust enrichment, attorney malpractice, professional malpractice, and negligent misrepresentation arising from Defendants' concerted scheme to defraud First Central into funding and/or purchasing millions of dollars of residential mortgage loans based upon false and misleading information.  After defrauding First Central, the Meridian Defendants brazenly concealed the fraud from First Central by continuing to make payments for borrowers who had defaulted on their obligations.  As a direct and proximate result of Defendants' unlawful actions, First Central has sustained "clear and definite" damages which continue to accrue as additional loans fail to perform.

## THE PARTIES

2.      First Central is a New York State chartered savings bank with a principal place of business located at 70 Glen Street, Glen Cove, New York 11542.  The fraudulent mortgage loans at issue in this action were either funded and/or purchased by First Central. First Central is the holder of the mortgage notes for the loans on which it has suffered damage.

3.      Meridian is a mortgage broker and mortgage banker with a principal place of business located at 2636 Nostrand Avenue, Brooklyn, New York.  Upon information and

belief, in or about June 2007, Meridian entered into a License Agreement with Trump Marks Mortgage LLC in which Meridian obtained a license to utilize the tradename, Trump Financial, and has been doing business as Trump Financial since that time.  Meridian is licensed to do business in twelve states, including New York, New Jersey, Connecticut and Florida.

        4.    Brecher is the CEO of Meridian and is an individual residing in New York.

        5.    MSI is a corporation with a principal place of business located at 2636 Nostrand Avenue, Brooklyn, New York.  Upon information and belief, MSI has no separate existence from Brecher and Meridian, and was utilized by Brecher and Meridian for the purpose of defrauding First Central.

        6.    DBS is a corporation with a principal place of business located at 2636 Nostrand Avenue, Brooklyn, New York.  Upon information and belief, DBS has no separate existence from Brecher and Meridian, and was utilized by Brecher and Meridian for the purpose of defrauding First Central.

        7.    NH Appraisals is a real estate appraisal company with a principal place of business located at 1236 48th Street, Brooklyn, New York 11219.

        8.    David S. Frankel, P.C. is New York law firm with a principal place of business located at 890 Franklin Avenue, Valley Stream, New York 11580.

        9.    MDS is a real estate appraisal company with a principal place of business located at 14714 SW 42nd Way, Miami, Florida 33185.

        10.    Shore is a New York law firm with a principal place of business located at 108-18 Queens Boulevard, Forest Hills, New York 11375.

3

11.     Mehl is an attorney with a principal place of business located at 3003 Avenue K, Brooklyn, New York 11210.

12.     True Valuations is a real estate appraisal company with a principal place of business at 4 Mordche Sher Blvd., Monroe, New York 10950.

13.     Admor is a real estate appraisal company with a principal place of business at 1127 E 81st Street, Brooklyn, New York 11236.

14.     Atrium Appraisal Services, Inc., is a real estate appraisal company with a principal place of business at 11980 SW 144th Ct., Suite 207, Miami, Florida 33186.

15.     The Addison Group is a real estate appraisal company with a principal place of business at 1168 Papen Road, Bridgewater, New Jersey 08807.

16.     Old Republic is a title insurance company and closing agent with a principal place of business at 505 Main Street, Hackensack, New Jersey 07601.

17.     Kesler is a real estate appraiser with a principal place of business located at MA Kesler & Associates, 270 Rutherford Blvd., Clifton, New Jersey 07014.

18.     MAK is a real estate appraisal company with a principal place of business located at 270 Rutherford Blvd., Clifton, New Jersey 07014.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this matter, pursuant to 28 U.S.C. § 1331 because this civil action arises under the laws of the United States.

20.     In addition, this Court has supplemental jurisdiction over First Central's state law claims pursuant to 28 U.S.C. § 1367.

21.   Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district, and because the ends of justice require that other parties residing in other districts be brought before the court.

## FACTS APPLICABLE TO ALL CAUSES OF ACTION

A.   **The Loan Origination Agreement**

22.   First Central is a New York State chartered savings bank which was chartered in 1999.  In or about 2003, Brecher offered to assist First Central to increase its presence in the residential real estate lending market by acting as First Central's originating and servicing agent in this capacity.

23.   On March 18, 2003, First Central entered into a Loan Origination and Marketing Agreement with the Meridian Defendants[1] which provided that the Meridian Defendants would act as First Central's agent with respect to the origination of residential mortgage loans that First Central would fund (the "Loan Origination Agreement").[2]  A copy of the Loan Origination Agreement is attached as Exhibit A.

24.   First Central and the Meridian Defendants entered into the Loan Origination Agreement with the express intention of First Central making short-term investments in residential mortgage loans which would be sold on the secondary market by the Meridian Defendants no later than 90 days after origination of the loans.  In fact, the Meridian

---

[1]   Upon information and belief, Brecher and Meridian exercised complete domination over MSI and used such domination to commit continuous fraudulent acts against First Central which are detailed below.  In this regard, MSI and Meridian have the same ownership and directorship, use common office space and equipment, and upon information and belief, fail to adhere to any corporate formalities.  Also, upon information and belief, Brecher completely dominates both MSI and Meridian, and is the alter-ego of both entities.

[2]   The Meridian Defendants also acted as First Central's servicing agent with respect to loans funded and/or purchased pursuant to the Loan Origination Agreement and Loan Purchase Agreement.  In this regard, the Meridian Defendants were required to collect all required monthly payments from the borrowers, including principal and interest and escrow payments.  After deducting a fee for its services, the Meridian Defendants were then required to forward the payments from the borrowers to First Central.

Defendants expressly agreed to purchase any loans from First Central that remained unsold in the secondary market after 90 days -- an obligation which Brecher personally guaranteed. In this regard, the Loan Origination Agreement provided that:

> MSI shall market the loans so that they are sold no later than 90 days after the closing of the Loan, provided, however, that [First Central] may extend such time period in its sole discretion by written notice to MSI. If MSI fails to sell any Loan within 90 days after closing, or within such longer period of time as [First Central] may permit, then MSI shall be required to purchase the Loan from the Bank at par plus accrued interest.

*See*, Ex. A, § 4.1(c).

25.   With respect to Brecher's personal guaranty, the Loan Origination Agreement provided that:

> By his signature, David Brecher, a principal of MSI and Meridian, guarantees to [First Central] the full and complete payment of all liabilities of MSI and Meridian to First Central under Section 6.3 hereof and the full and complete performance of MSI's and Meridian's obligations under Section 4.1. David Brecher further agrees and that any modification of this Agreement approved by Meridian or MSI, and any consent, extension, notice or other action taken by Meridian or MSI with respect to this Agreement or their obligations hereunder shall be fully and completely binding upon him as a guarantor notwithstanding that he has not separately consented to such modification, consent, extension, notice or other action.

*See*, *Id.*, § 6.4(a).

26.   The Loan Origination Agreement also outlined the procedures and obligations of the parties to be utilized with respect to the origination and closing of each loan transaction. In this regard, under the Loan Origination Agreement, if a customer of the Meridian Defendants desired to apply for a residential mortgage loan, the Meridian Defendants, in their capacity as mortgage broker, were required to perform an underwriting analysis of the application after obtaining information from the customer, including, but not limited to: (a) a completed loan application; (b) a credit report; (c) a property appraisal; and (d)

6

any other necessary verifications and documents.   Specifically, section 3.1(a) of the Loan

Origination Agreement provided that:

> If a customer or potential customer of Meridian desires to apply for a residential loan which Meridian desires to be governed by [the Loan Origination Agreement], Meridian shall, acting in the capacity of a mortgage broker, collect a loan Application, obtain a credit report and appraisal, and obtain all other verifications and documents in order to underwrite the loan.
>
>        *       *       *       *
>
> Upon a determination by MSI that it desires to submit the Application to [First Central] for approval and closing, MSI shall provide [First Central] with copies of the loan application, the mortgage brokerage agreement, the borrower's authorization to release information, copies of all other disclosures provided to the borrower, including, without limitation, the broker disclosure, the good faith estimates and the preliminary truth in lending disclosure statement, and such other documents that [First Central] may request. Upon receipt of such documents, [First Central] shall review the Application and determine whether to approve it.

*See, Id.*, § 3.1(a).

       27.   Under the Loan Origination Agreement, after compiling and reviewing the

loan information from the customer, the Meridian Defendants were originally required to

determine whether it complied with the applicable underwriting standards and whether to

submit the application to First Central for approval. *See, Id.*

       28.   However, on or about December 23, 2003, the Loan Origination

Agreement was expressly modified by the parties in order to permit the Meridian Defendants

to make its own credit judgments on loans covered by the Loan Origination Agreement, a

procedure which had been utilized by the parties since the inception of the Loan Origination

Agreement.  A copy of the Modification Agreement is attached as Exhibit B.  Specifically the

December 23, 2003 Modification Agreement provided that:

> This is to formally amend the Loan Origination and Marketing Agreement entered into on March 18, 2003 by Meridian Mortgage

> Services, Inc., Meridian Residential Capital and First Central Savings Bank so as to conform that written document to the actual practices of the parties thereunder. The Meridian companies have and will continue to make the credit judgments on the transactions covered by that agreement and the Bank will rely on the Meridian companies to make such judgments ....

*See*, Ex. B.

29.   At all times, the Meridian Defendants had an obligation to ensure that the information collected and submitted to First Central was true and accurate, especially since the Meridian Defendants were aware that First Central would have had no direct or independent contact with the potential borrowers at that time and would rely upon the information submitted by the Meridian Defendants.

30.   Furthermore, the Loan Origination Agreement provided that the Meridian Defendants would be entitled to compensation for providing its services to First Central.   In this regard, the Meridian Defendants were permitted to retain all fees paid by the customer, less $375.00 paid to First Central at closing.  *See*, Ex. A, § 3.12(a).

31.   Moreover, the Meridian Defendants also retained a percentage of the original principal loan balance that was paid upon the sale of the loan on the secondary market by the Meridian Defendants. *See*, *Id.*

32.   As such, the Meridian Defendants had a clear financial incentive to originate and close as many residential mortgage loans under the Loan Origination Agreement as practically possible.

**B.   The Loan Purchase Agreements**

33.   Beginning in January, 2003, First Central and the Meridian Defendants also entered into approximately twenty-six (26) individual Loan Purchase Agreements (the "Loan Purchase Agreements") by which the Meridian Defendants sold First Central residential

mortgage loans with the express understanding that the Meridian Defendants would repurchase such loans within 90 days of the date of each individual Loan Purchase Agreement.[3]  In this regard, each Loan Purchase Agreement provided that:

> Meridian hereby sells to [First Central] and [First Central] hereby purchases from Meridian ... [] loans which are identified in Schedule A annexed hereto ....
>
> *      *      *      *
>
> Meridian agrees, unconditionally, to repurchase the Loan Package from [First Central] within 90 days of the date hereof for the then aggregate outstanding principal balance of the loans, plus all accrued interest.

*See*, Ex. C, §§ 1, 3.

34.    The Loan Purchase Agreements also provided that First Central would be entitled to liquidated damages in the event that the Meridian Defendants failed to repurchase the loans within 90 days:

> In the event that Meridian breaches its obligation under Paragraph 3 hereof to repurchase the Loan Package within [90] days, the parties acknowledge that the damage caused to [First Central] will be difficult if not impossible, to quantify and, accordingly, agree that, in such event, [First Central] shall be entitled to liquidated damages in an amount which will yield [First Central] a return of 17.5% per annum for the period of default, inclusive of interest earned from the borrowers on the Loan Package.

*See*, *Id*, at § 8.

35.    The Loan Purchase Agreements also provided that the Meridian Defendants had no actual knowledge of any false information being provided to First Central. Specifically, the Meridian Defendants averred that: (i) all documents submitted in connection with each loan application, or for the closing of each loan, are in every respect valid and genuine, being on their face what they purport to be; (ii) all information (credit or otherwise)

---

3    Each of the Loan Purchase Agreements are identical in their language and format, except for the number of loans purchased and the amount paid for the loans.  A copy of the July 28, 2003 Loan Purchase Agreement, as well as a list of dates for all Loan Purchase Agreements are attached as Exhibits C and D, respectively.

submitted in connection with each loan application is true and accurate; (iii) all signatures on the loan application, if signed, and on each promissory note, mortgage and all other loan documents, purporting to be signed by the borrower or any guarantor are the true signatures of the person that they purport to be, except for those which are signed pursuant to valid enforceable powers of attorney, which signatures are the true signatures of the person or persons holding such power of attorney; and (iv) no fraudulent information has been provided to [First Central] with respect to any loan. *See Id*, at § 5(d).

36.    Between January 22, 2003 through August 31, 2005, First Central purchased residential mortgage loans from the Meridian Defendants pursuant to the Loan Purchase Agreements (the "Purchase Pool Loans").

37.    To date, the Meridian Defendants failed to repurchase a significant percentage of the Purchase Pool Loans within 90 days of the date of each Loan Purchase Agreement. Rather, these Purchase Pool Loans are still owned by First Central.

38.    Moreover, a significant percentage of the Purchase Pool Loans were originated pursuant to the Loan Origination Agreement. As such, the fraudulent conduct of the Meridian Defendants outlined below with respect to the loans originated under the Loan Origination Agreement equally impacts the Purchase Pool Loans.

C.    **The Unlawful Conduct of the RICO Defendants**

39.    From 2003 to 2008, the Meridian Defendants consistently prepared and/or assisted in the preparation or caused to be submitted fraudulent documentation and information to First Central for the purpose of inducing First Central to fund and/or purchase residential mortgage loans.

40.   To manage and control the entire process, the Meridian Defendants consistently selected and utilized real estate appraisers, closing attorneys and closing agents which the Meridian Defendants knew would advance the financial interests of both the Meridian Defendants and themselves over the interests of First Central.

41.   In this regard, the Meridian Defendants selected and consistently utilized the following real estate appraisers with respect to loans funded and/or purchased by First Central under the Loan Origination Agreement and the Loan Purchase Agreements: (1) NH Appraisals for residential mortgage loans with properties located in New York, (2) MDS for residential mortgage loans with properties located in Florida, (3) Atrium Appraisal for residential mortgage loans with properties in Florida, (4) True Valuations for residential mortgage loans with properties located in New York; (5) Admor for residential mortgage loans with properties in New York, (6) the Addison Group for residential mortgage loans with properties in New Jersey, (7) Kesler and MAK for residential mortgage loans with properties located in New Jersey, and (8) Solar for residential mortgage loans with properties located in Florida. Collectively, these appraisers are referred to as the "Appraiser Defendants."

42.   At all times, the Appraiser Defendants were acting on behalf of First Central and were required under color of law to protect the interests of First Central, and knew or should have known that their work would be relied upon by First Central.

43.   The Meridian Defendants also selected and consistently utilized the following closing attorneys and closing agents with respect to loans funded and/or purchased by First Central under the Loan Origination Agreement and the Loan Purchase Agreements: (1) Frankel, (2) Shore, (3) Mehl, (4) Bohensky, and (5) Old Republic.   Collectively, these attorneys are referred to as the "Attorney Defendants."

11

44. At all times, the Attorney Defendants were acting on behalf of First Central and were required under color of law to protect the interests of First Central, and knew or should have known that their work would be relied upon by First Central.

45. Beginning in 2003, the Meridian Defendants, the Appraiser Defendants, and the Attorney Defendants (collectively, the "RICO Defendants") defrauded First Central, a financial institution, by engaging in a pattern of racketeering through the use of misrepresentations and omissions causing significant damage to First Central.

46. Upon information and belief, from 2003 through 2008, the RICO Defendants originated, closed and/or sold approximately 225 residential mortgage loans. To date, approximately 75 of these loans are currently non-performing and are in default (the "Non-Performing Loans"). Approximately 40 of the Non-Performing Loans are in various stages of the foreclosure process, with 8 loans either being sold or held by First Central after judgment with the remainder awaiting the issuance of a judgment of foreclosure or auction sale.

47. First, the Meridian Defendants consistently submitted fraudulent documentation and information to First Central through the use of the United States' mail, private carriers, facsimile, telephones and the internet, regarding the credit worthiness and financial condition of the customers. For example, the Meridian Defendants overstated the incomes of numerous customers or had reason to believe that the incomes of numerous customers were being overstated, including Victor Marquis Cooper who was issued two loans for a total of $391,500 in or about February 2006. The Meridian Defendants fraudulently misstated, or had reason to believe that was being misstated, Mr. Cooper's income as $77,744

on the application, an intentional overstatement of $32,327 for the purpose of inducing First Central to purchase the loans from the Meridian Defendants.

48.   Upon information and belief, the Meridian Defendants also overstated the monthly income Rifka Rubin ("Rubin") who was issued a loan for $536,000 in 2006. In this regard, the Meridian Defendants misstated Rubin's income as $12,500 per month, or $150,000 per year, despite the fact that Rubin worked in a fish market -- a salary that appears disproportionate for this occupation. The Meridian Defendants fraudulently misstated, or had reason to believe that was being misstated, Ms. Rubin's income for the purpose of inducing First Central to purchase the loans from the Meridian Defendants.

49.   Upon information and belief, the Meridian Defendants intentionally overstated the incomes of additional customers on applications for the purpose of inducing First Central to fund mortgage loans, including, but not limited to, financial information submitted for, Zhanna Bober, Jose A. Ponce Diaz, and Ratza M. Schiff, all of which, upon information and belief, included overstated monthly income levels.

50.   Moreover, the Meridian Defendants also omitted relevant information from customer applications. In this regard, the Meridian Defendants permitted a mortgage loan issued to Paul Lopapa ("Lopapa") to fund in February 2006 despite the fact that Lopapa had been convicted of bank fraud in May 2005. The Meridian Defendants knew or reasonably should have known that Lopapa had been convicted of this crime, but they never provided such information to First Central. It is without question that if First Central had been provided with this information, it would not have funded the loan to Lopapa.

51.   As a direct and proximate cause of the Meridian Defendants' conduct with respect to submitting fraudulent documents and information to First Central, First Central

funded and/or purchased loans on the reasonable belief that the documentation and information submitted by the Meridian Defendants was not fraudulent and was accurate.  First Central would not have otherwise funded and/or purchased these loans.

52.  Second, the Meridian Defendants and the Appraiser Defendants consistently prepared and submitted loan applications to First Central which contained fraudulently overstated appraisals.

53.  The Meridian Defendants and the Appraiser Defendants knew, or reasonably should have known, that these appraisals contained material omissions and misstatements of fact which substantially inflated the market values of the properties. Examples of fraudulent appraisals prepared and submitted by the Meridian Defendants and the Appraiser Defendants are as follows:

- In late 2004, First Central funded a mortgage loan to Hay Abeckaser ("Abeckaser") for $906,500, and subsequently repurchased the loan from the Meridian Defendants in July 2005. First Central approved the funding and purchase of the loan based in part on a property appraisal by NH Appraisals in September 2004.  This appraisal -- which valued the property at **$1,275,000** -- was submitted by the Meridian Defendants to First Central.  However, a subsequent appraisal performed in May 2008 demonstrates that the actual value of the property was **$750,000 -- a significant overstatement of $525,000 or 41%** in a reasonably short period of time.  Although the Meridian Defendants and NH Appraisals knew or reasonably should have known that this appraisal was fraudulently overstated, they still submitted it to First Central with the intention of inducing First Central to fund and subsequently purchase the loan.

- In or about 2006, First Central funded and subsequently purchased two mortgage loans for Adam Jones ("Jones"), each for a total of $322,500. First Central approved the funding and purchase of the loans based in part on property appraisals prepared by MDS in April 2006.  The loans were secured by two identical apartments which were adjoining in a residential building, namely Apartment Nos. 202 and 203 at 1745 James Street, South Beach, Florida. The appraisals -- which valued both apartments separately at **$430,000** -- were submitted by the Meridian Defendants to First Central.  However, a subsequent appraisal in May 2008 demonstrated that

the original appraisals made material omissions and misstatements of fact and that the actual value of the properties was **$170,000 -- a significant overstatement of $280,000 or 60%** in a reasonably short period of time. Thereafter, the properties were sold after foreclosure -- **Apartment 202 sold in July 2008 for $178,335 and Apartment 203 sold in September 2008 for $177,420** -- further evidence that the original appraisals were substantially overstated. Although the Meridian Defendants and MDS knew or reasonably should have known that these appraisals were fraudulently overstated, they still submitted them to First Central with the intention of inducing First Central to fund and purchase the loans for Jones.

- In January 2006, First Central funded mortgage loans to Richard T. Baker ("Baker") for $1,600,000. First Central approved the loans to Baker based in part on a property appraisal by Trustman Realty in December 2005. This appraisal -- which valued the property at **$2,000,000** -- was submitted by the Meridian Defendants to First Central as part of Baker's loan application. However, a subsequent appraisal performed in May 2008 demonstrates that the original appraisal made material omissions and misstatements of fact and that the actual value of the property was **$460,000 -- a significant overstatement of $1,540,000 or 77%** in a reasonably short period of time. Although the Meridian Defendants and Trustman Realty knew or reasonably should have known that this appraisal was fraudulently overstated, they still submitted it to First Central with the intention of inducing First Central to fund the loans to Baker.

- In or about April 2006, First Central purchased two mortgage loans for Miesel Lugo ("Lugo") for $269,100. First Central approved the purchase based in part on a property appraisal by the Addison Group in February 2006. This appraisal -- which valued the property at **$300,000** -- was submitted by the Meridian Defendants to First Central. However, a subsequent appraisal performed in April 2008 demonstrates that the original appraisal made material omissions and misstatements of fact and that the actual value of the property was **$165,000 -- a significant overstatement of $135,000 or 45%** in a reasonably short period of time. Although the Meridian Defendants and the Addison Group knew or reasonably should have known that this appraisal was fraudulently overstated, they still submitted it to First Central with the intention of inducing First Central to purchase the loans.

- In or about 2005, First Central purchased a mortgage loan for Magdalena Fudali ("Fudali") for $190,000. First Central approved the purchase of the loan based in part on a property appraisal by Solar in July 2006. This appraisal -- which valued the property at **$1,400,000** -- was submitted by the Meridian Defendants to First Central. However, a subsequent

15

appraisal performed in April 2008 demonstrates that the original appraisal made material omissions and misstatements of fact and that the actual value of the property was **$780,000 -- a significant overstatement of $620,000 or 44%** in a reasonably short period of time. Although the Meridian Defendants and Solar knew or reasonably should have known that this appraisal was fraudulently overstated, they still submitted it to First Central with the intention of inducing First Central to purchase the loan.

- In or about May 2007, First Central funded two mortgage loans to Zajde Krasz ("Krasz") for $672,000 and $192,000. First Central approved the loans to Krasz based in part on a property appraisal by True Valuations in March 2007. This appraisal -- which valued the property at **$960,000** -- was submitted by the Meridian Defendants to First Central as part of Krasz's loan application. However, a subsequent appraisal performed in November 2008 demonstrates that the original appraisal made material omissions and misstatements of fact and that the actual value of the property was **$350,000 -- a significant overstatement of $610,000 or 63%** in a reasonably short period of time. Although the Meridian Defendants and True Valuations knew or reasonably should have known that this appraisal was fraudulently overstated, they still submitted it to First Central with the intention of inducing First Central to fund the loan to Krasz.

- In or about April 2007, First Central funded a mortgage loan to Ronnie Braha ("Braha") for $500,000. First Central approved the loan to Braha based in part on a property appraisal by Admor on July 20, 2006. This appraisal -- which valued the property at **$4,000,000** -- was submitted by the Meridian Defendants to First Central. However, a subsequent appraisal performed on August 5, 2008 demonstrates that the actual value of the property was **$2,200,000 -- a significant overstatement of $1,800,000 or 45%** in a reasonably short period of time. Although the Meridian Defendants and Admor knew or reasonably should have known that this appraisal was fraudulently overstated, they still submitted it to First Central with the intention of inducing First Central to fund the loan to Braha.

- In or about June 2006, First Central funded a mortgage loan to Joshua Pollack ("Pollack") for $490,000. First Central approved the loan to Pollack based in part on a property appraisal by NH Appraisals in April 2006. This appraisal -- which valued the property at **$1,650,000** -- was submitted by the Meridian Defendants to First Central as part of Pollacks' loan application. However, a subsequent appraisal performed in May 2008 demonstrates that the actual value of the property was **$1,000,000 -- a significant overstatement of $650,000 or 60%** in a reasonably short period of time. Although the Meridian Defendants and NH Appraisals

16

knew or reasonably should have known that this appraisal was fraudulently overstated, they still submitted it to First Central with the intention of inducing First Central to fund the loan to Pollack.

- In or about June 2006, First Central funded a mortgage loan to Daniel Meyers ("Meyers") for $500,000. First Central approved the loan to Meyers based in part on a property appraisal by NH Appraisals in June 2006. This appraisal -- which valued the property at **$1,900,000** -- was submitted by the Meridian Defendants to First Central as part of Meyer's loan application. However, a subsequent appraisal performed in April 2008 demonstrates that the actual value of the property was **$1,200,000 -- a significant overstatement of $700,000 or 36%** in a reasonably short period of time. Although the Meridian Defendants and NH Appraisals knew or reasonably should have known that this appraisal was fraudulently overstated, they still submitted it to First Central with the intention of inducing First Central to fund the loan to Meyers.

- On December 12, 2005, First Central funded two mortgage loans to Gladys Ross ("Ross") for a total of $1,000,000. First Central approved the loans to Ross based in part on a property appraisal by NH Appraisals in November 2005. This appraisal -- which valued the property at **$1,225,000** -- was submitted by the Meridian Defendants to First Central as part of Ross' loan application. However, a subsequent appraisal performed in February 2009 demonstrates that the actual value of the property was **$825,000 -- a significant overstatement of $400,000 or 32%** in a reasonably short period of time. Although the Meridian Defendants and NH Appraisals knew or reasonably should have known that this appraisal was fraudulently overstated, they still submitted it to First Central with the intention of inducing First Central to fund the loan to Ross.

- On February 15, 2006, First Central purchased a mortgage loan for Sylvain Meinmoun ("Meinmoun") for $1,200,000. First Central approved the loan purchase based in part on a property appraisal by MDS Appraisals in February 2006. This appraisal -- which valued the property at **$1,500,000** -- was submitted by the Meridian Defendants to First Central. However, a subsequent appraisal performed in January 2009 demonstrates that the actual value of the property was **$900,000 -- a significant overstatement of $600,000 or 40%** in a reasonably short period of time. Upon information and belief, a comparison of the two appraisals also indicates that MDS appraised a different property than the mortgaged premises. Although the Meridian Defendants and MDS knew or reasonably should have known that this appraisal was fraudulently overstated, they still submitted it to First Central with the intention of inducing First Central to purchase the loan.

- In or about December 2005, First Central funded a mortgage loan to Doreen Rush ("Rush") for $1,592,000. First Central approved the loan to Rush based in part on a property appraisal by NH Appraisals in November 2005. This appraisal -- which valued the property at **$2,450,000** -- was submitted by the Meridian Defendants to First Central as part of Rush's loan application. However, a subsequent appraisal performed in April 2008 demonstrates that the actual value of the property was **$1,900,000** -- **a significant overstatement of $550,000 or 22%** in a reasonably short period of time. Although the Meridian Defendants and NH Appraisals knew or reasonably should have known that this appraisal was fraudulently overstated, they still submitted it to First Central with the intention of inducing First Central to fund the loan to Rush.

- In or about February 2007, First Central funded a mortgage loan to Jose Baez ("Baez") for $262,000. First Central approved the loan to Baez based in part on two property appraisals -- an appraisal by Atrium Appraisals in November 2006 which valued the property at **$1,900,000**, and an appraisal by Solar in January 2007 which valued the property at **$1,800,000**. Both appraisals were submitted by the Meridian Defendants to First Central as part of Baez's loan application. However, a subsequent appraisal performed in October 2008 demonstrates that the original appraisals made material omissions and misstatements of fact and that the actual value of the property was **$850,000 -- significant overstatements of $1,050,000 and $950,000,** respectively, in a reasonably short period of time. Although the Meridian Defendants and both Atrium Appraisals and Solar knew or reasonably should have known that this appraisal was fraudulently overstated, they still submitted it to First Central with the intention of inducing First Central to fund the loan to Baez.

- In or about 2005, First Central purchased a mortgage loan for Eliyahu Green ("Green") for $248,000. First Central approved the purchase of the loans based in part on a property appraisal by Kesler and MAK in September 2004. This appraisal -- which valued the property at $340,000 -- was submitted by the Meridian Defendants to First Central. The property was sold at a foreclosure sale on March 19, 2008 for **$234,696.09** -- **a significant 30% decrease** in value from the 2004 appraisals. Although the Meridian Defendants knew or reasonably should have known that this appraisal was fraudulently overstated, they still submitted it to First Central with the intention of inducing First Central to purchase the loan for Green.

54. These egregious examples of fraudulent appraisals are representative of the fraudulent conduct that consistently occurred in a significant percentage of the Non-Performing Loans by the Meridian Defendants and the Appraiser Defendants. As

demonstrated by the subsequent appraisals and sales, the fraudulent appraisals contained misstatements and omissions and substantially overstated the values of the collateral properties on such a repeated and consistent basis to make it impossible for this to be an accident or coincidence.

55.   As a direct and proximate cause of the Meridian Defendants' and the Appraiser Defendants' continuing pattern of racketeering activity with respect to the overstated appraisals, First Central funded and/or purchased the Non-Performing Loans on the reasonable belief that the properties' market values exceeded the loan amounts by a sufficient margin to give First Central comfort that the loans were secure.  First Central would not have otherwise entered into these transactions.

56.   Third, the Meridian Defendants and the Attorney Defendants consistently closed mortgage loans with documentation containing terms that were materially different from those agreed to by First Central.  In this regard, a majority of the Non-Performing Loans had commitment letters issued by First Central which contained adjustable interest rates with interest rate floors -- an essential term to protect a lender in a declining interest rate environment.  However, upon information and belief, the Meridian Defendants and the Attorney Defendants intentionally closed these loans without interest rate floors -- loans that once closed would yield significant fees to the Meridian Defendants and the Attorney Defendants. Examples of this unlawful conduct are as follows:

- In or about 2006, First Central issued a commitment letter to Meyers which contained an interest rate floor of 10.75%. However, although the Meridian Defendants and Mehl were aware of this term when the loan documents were prepared and at the time of closing, they permitted the loan to close without the inclusion of any interest rate floor in the final loan documents, including the note executed by Meyers.

19

- In or about 2006, First Central issued a commitment letter to Lugo which contained an interest rate floor of 9.5%. However, although the Meridian Defendants and Old Republic were aware of this term when the loan documents were prepared and at the time of closing, they permitted the loan to close without the inclusion of any interest rate floor in the final loan documents, including the note executed by Lugo.

- In or about 2005, First Central issued a commitment letter to Mayala Wentz ("Wentz") which contained an interest rate floor of 9.25%. However, although the Meridian Defendants and Frankel were aware of this term when the loan documents were prepared and at the time of closing, they permitted the loan to close without the inclusion of any interest rate floor in the final loan documents, including the note executed by Wentz.

- In or about 2007, First Central issued a commitment letter to Carmine Alessandro ("Alessandro") which contained an interest rate floor of 11.00%. However, although the Meridian Defendants and Frankel were aware of this term when the loan documents were prepared and at the time of closing, they permitted the loan to close without the inclusion of any interest rate floor in the final loan documents, including the note executed by Alessandro.

- In or about 2006, First Central issued a commitment letter to Eyal Levy ("Levy") which contained an interest rate floor of 6.125%. However, although the Meridian Defendants and Bohensky were aware of this term when the loan documents were prepared and at the time of closing, they permitted the loan to close without the inclusion of any interest rate floor in the final loan documents, including the note executed by Levy.

- In or about 2006, First Central issued a commitment letter to Rubin which contained an interest rate floor of 5.75%. However, although the Meridian Defendants and Bohensky were aware of this term when the loan documents were prepared and at the time of closing, they permitted the loan to close without the inclusion of any interest rate floor in the final loan documents, including the note executed by Rubin.

- In or about 2005, First Central issued a commitment letter to Fethi Abouaziz ("Abouaziz") which contained an interest rate floor of 9.00%. However, although the Meridian Defendants and Shore were aware of this term when the loan documents were prepared and at the time of closing, they permitted the loan to close without the inclusion of any interest rate floor in the final loan documents, including the note executed by Abouaziz.

- In or about 2006, First Central issued a commitment letter to Erwin Goldstein ("Goldstein") which contained an interest rate floor of 9.25%. However, although the Meridian Defendants and Shore were aware of this

term when the loan documents were prepared and at the time of closing, they permitted the loan to close without the inclusion of any interest rate floor in the final loan documents, including the note executed by Goldstein.

- In or about 2006, First Central issued a commitment letter to Tanya Gendelman ("Gendelman") which contained an interest rate floor of 10.75%. However, although the Meridian Defendants and Shore were aware of this term when the loan documents were prepared and at the time of closing, they permitted the loan to close without the inclusion of any interest rate floor in the final loan documents, including the note executed by Gendelman.

- In or about 2005, First Central issued a commitment letter to Braha which contained an interest rate floor of 10.25%. However, although the Meridian Defendants and Frankel were aware of this term when the loan documents were prepared and at the time of closing, they permitted the loan to close without the inclusion of any interest rate floor in the final loan documents, including the note executed by Braha.

57. These egregious examples are reflective of the omissions and misstatements that were made at closing by the Meridian Defendants and the Attorney Defendants in a significant percentage of the Non-Performing Loans.

58. Fourth, the Meridian Defendants and the Attorney Defendants consistently permitted mortgage loans to close with funding by First Central despite the fact that they had knowledge of facts that adversely affected First Central's interests with respect to the loans. For example, the Meridian Defendants and Mehl permitted the mortgage loan issued to Meyers to close in September 2007 despite the fact that they knew or reasonably should have known that there existed a prior judgment for $103,000 and an outstanding *lis pendens* against the property. Upon information and belief, the Meridian Defendants and Mehl withheld such information from First Central for the purpose of inducing First Central to fund the loan to Meyers.

59. Also, the Meridian Defendants and Frankel permitted a mortgage loan issued to Braha to close despite the fact that they knew or reasonably should have known that

there existed outstanding New York City Department of Buildings' violations against the mortgaged premises.  Upon information and belief, the Meridian Defendants and Frankel withheld such information from First Central for the purpose of inducing First Central to fund the loan to Braha.

60.  Also, the Meridian Defendants and Frankel permitted the mortgage loan issued to Rush to close despite the fact that they knew or reasonably should have known that there existed prior Internal Revenue Service tax liens.  Upon information and belief, the Meridian Defendants and Frankel withheld such information from First Central for the purpose of inducing First Central to fund the loan to Rush.

61.  Moreover, the Meridian Defendants and the Attorney Defendants permitted mortgage loans to close without meeting the closing requirements of First Central. For example, the Meridian Defendants and Shore permitted a mortgage loan issued to Dana Bober ("Bober") to close in January 2007 despite the fact that Bober had not paid the correct amounts of money to close the loan, including funds required for private mortgage insurance.

62.  The Meridian Defendants and Frankel also permitted a mortgage loan issued to Wentz to close in November 2005 despite the fact that the Meridian Defendants and Frankel failed to collect escrow funds from Wentz which were required by First Central.

**D.    The Fraud is Concealed by the Meridian Defendants**

63.  From 2003 through 2008, the Meridian Defendants compounded the fraud of the RICO Defendants by taking calculated steps to conceal the fraud of the RICO Defendants from First Central.  In this regard, despite the fact that certain of the mortgage loans which were funded and/or purchased by First Central had defaulted, the Meridian Defendants, as the servicer of the loans, continued to make the required payments on behalf of

22

the borrowers in a timely manner to prevent First Central from becoming alerted to the qualitative issues with such loans and to take steps to protect its interests.  Examples of the Meridian Defendants' efforts to conceal the fraud are as follows:

- Upon information and belief,[4] the mortgage loan for Abeckaser, which was closed in 2004 by First Central, defaulted one year later in early 2005. However, the Meridian Defendants concealed the fraud and the borrower's default by continuing to make the required monthly payments until early 2007.  Thus, upon information and belief, the loan had been in default for two years before First Central discovered the fact that it had been defrauded.

- Upon information and belief, the mortgage loan for Lugo, which was closed in March 2006 and purchased by First Central in April 2006, defaulted immediately in August 2006.  However, upon information and belief, the Meridian Defendants concealed the fraud and the borrower's default by continuing to make the required monthly payments until 2008. Thus, upon information and belief, this loan had been in default for over one year before First Central discovered the fact that it had been defrauded.

- Upon information and belief, the mortgage loan for Fudali, which was purchased by First Central in or about 2006, defaulted shortly after purchase.  However, upon information and belief, the Meridian Defendants concealed the fraud and the borrower's default by continuing to make the required monthly payments until August 2007.

- Upon information and belief, the mortgage loans for Jones, which were purchased by First Central in or about 2006, defaulted shortly after purchase.  However, upon information and belief, the Meridian Defendants concealed the fraud and the borrower's default by continuing to make the required monthly payments until August 2007.

- Upon information and belief, the mortgage loan for Baker, which was funded by First Central in or about January 2006, defaulted immediately. However, upon information and belief, the Meridian Defendants concealed the fraud and the borrower's default by continuing to make the required monthly payments until March 2007.

- Upon information and belief, the mortgage loan for Rifky Rubenstein, which was funded by First Central in or about May 2006, defaulted in or about October 2006.  However, upon information and belief, the Meridian

---

4   The allegations based upon "information and belief" contained in ¶ 63 are derived from a review of documents and files provided by the Meridian Defendants to First Central, including the individual loan files prepared and maintained by the Meridian Defendants, as servicer of the loans.

Defendants concealed the fraud and the borrower's default by continuing to make the required monthly payments until 2008.

- Upon information and belief, the mortgage loan for Baez, which was closed in February 2007, defaulted less than a year later in January 2008. However, upon information and belief, the Meridian Defendants concealed the fraud and the borrower's default by continuing to make the required monthly payments until late 2008. Thus, upon information and belief, this loan had been in default for a significant amount of time before First Central discovered the fact that it had been defrauded.

- Upon information and belief, the mortgage loan for Krasz, which was closed in May 2007, defaulted only a year later in May 2008. However, upon information and belief, the Meridian Defendants concealed the fraud and the borrower's default by continuing to make the required monthly payments through late 2008. Thus, upon information and belief, this loan had been in default for a significant amount of time before First Central discovered the fact that it had been defrauded.

- Upon information and belief, the mortgage loans for Green, which were closed in September 2004, upon information and belief, defaulted immediately. However, upon information and belief, the Meridian Defendants concealed the fraud and the borrower's default by continuing to make the required monthly payments after the loan defaulted. Upon information and belief, the loans had been in default for a significant amount of time before First Central discovered the fact that it had been defrauded.

64.    The examples set forth above are reflective of the Meridian Defendants' concealment with respect to a significant percentage of the Non-Performing Loans. Such concealment was undertaken by the Meridian Defendants for the purpose of preventing First Central from discovering the fraud of the RICO Defendants.

**E.    First Central's Losses Were Proximately
Caused by the RICO Defendants' Unlawful Conduct**

65.    Absent the RICO Defendants' fraudulent conduct detailed above, First Central would not have entered into the subject transactions by funding and/or purchasing the Non-Performing Loans, and by continuing to fund and purchase subsequent loans which also became non-performing.

24

66.   Upon information and belief,[5] in a large percentage of the Non-Performing Loans, the borrower defaulted on its obligations shortly after the loan was closed causing First Central's losses.  For example:

- Upon information and belief, the mortgage loan for Lugo, which was closed in March 2006, and was purchased by First Central in April 2006, defaulted immediately in August 2006.

- Upon information and belief, the mortgage loan for Baez, which was closed in February 2007, defaulted less than a year later in January 2008.

- Upon information and belief, the mortgage loan for Krasz, which was closed in May 2007, defaulted one year later in May 2008.

- Upon information and belief, the mortgage loan for Braha, which was closed in April 2007, defaulted one year later in April 2008.

- Upon information and belief, the mortgage loan for Diaz, which was closed in December 2005, defaulted approximately 14 months later in February 2006.

- Upon information and belief, the mortgage loan for Baker, which was funded by First Central in or about January 2006, defaulted immediately.

- Upon information and belief, the mortgage loan for Abeckaser, which was closed in 2004, defaulted one year later in 2005.

- Upon information and belief, the mortgage loan for Rubenstein, which was funded by First Central in or about May 2006, defaulted in or about October 2006.

- Upon information and belief, the mortgage loans for Fudali, which were closed and purchased in September 2006, defaulted shortly thereafter.

- Upon information and belief, the mortgage loan for Wentz, which was closed in November 2005, defaulted approximately 13 months later in January 2006.

---

5     The allegations based upon "information and belief" contained in ¶ 66 are derived from a review of documents and files provided by the Meridian Defendants to First Central, including the loan files prepared and maintained by the Meridian Defendants.

25

- Upon information and belief, the mortgage loan for Gendelman, which was closed in October 2006, defaulted approximately 9 months later in July 2007.

67.   These examples are reflective of the timing of defaults for a significant percentage of the Non-Performing Loans, with the bulk of the defaults occurring within one year after the loan was closed.   However, even though the Non-Performing Loans were defaulting shortly after closing, this situation was not known to First Central since the Meridian Defendants were concealing the defaults and the fraud by making required payments for the loans.

68.   The minimal amount of time that elapsed between the fraudulent actions of the RICO Defendants and the defaults of the Non-Performing Loans clearly demonstrates that First Central's losses are directly attributable to the fraud of the RICO Defendants, and that no external factors contributed to such losses.

69.   Furthermore, as set forth above in ¶¶ 52-55, the appraisals of the collateral properties were substantially above the actual values of the properties at the time of the misrepresentations.   In some of these instances, the overstatement of the property value in the appraisal was as high as 77%.   The subsequent appraisals are a reliable indicator of the magnitude of the overstatement since the subsequent appraisals utilized the same methodologies as the initial appraisals and were conducted within a reasonable time after the initial appraisals.

70.   In short, the quick default dates of the Non-Performing Loans coupled with the substantially inflated appraisals demonstrates that the RICO Defendants' fraudulent conduct was the proximate cause of First Central's damages and losses relating to the Non-Performing Loans.

**F.    First Central Has Suffered "Clear and Definite" Losses**

71.   First Central has suffered "clear and definite" damage to its business which is directly attributable to the RICO Defendants' fraudulent conduct.  In this regard, First Central has suffered "clear and definite" losses with respect to eight Non-Performing Loans which have been foreclosed by First Central.

1.    **Hay Abeckaser**

72.   The Abeckaser mortgage loan was closed in 2004 in the principal amount of $906,500, and upon information and belief, defaulted one year later in 2005.  The property securing the mortgage loan was located at 1219 E. 10th Street, Brooklyn, New York 11230.

73.   In September 2004, NH Appraisals performed an appraisal and valued the property at $1,275,000.   However, a subsequent appraisal was performed in May 2008 determined that the actual value of the property was $750,000 -- a significant overstatement of $525,000 or 41% in a reasonably short period of time.

74.   A judgment of foreclosure was entered which ordered that the mortgaged property be sold with the proceeds of such sale remitted to First Central.

75.   A public foreclosure sale of the mortgaged property was held with no third-party purchaser submitting a bid for the property.  Thereafter, 1219 E. 10th Street became a Real Estate Owned ("REO") property which was held and offered for sale by First Central.

76.   After the failed public auction, First Central inspected the property and determined that its poor condition rendered it unsaleable.  First Central was then forced to have capital improvements performed on the property at a cost of $102,000.

77. In July 2009, the property was sold to an independent third-party for $785,000. At the time of sale, the outstanding balance of the Abeckaser mortgage loan was $938,000, plus $18,458.91 in expenses, totaling $956,458.91.

78. As such, a "clear and definite" loss of $320,458.91 exists which represents the deficiency amount that was unrecoverable through foreclosure, plus (i) the cost of the capital improvements performed by First Central, totaling $102,000, and (ii) a real estate brokerage fee in the amount of $47,000.

## 2. **Richard T. Baker**

79. The Baker mortgage loans were closed in January 2006 in the principal amounts of $1,500,000.00 and $100,000.00, and, upon information and belief, both loans defaulted immediately in March 2007. The property securing the mortgage loans was located at 193 Wildwood Road, Midland, Pennsylvania.

80. A judgment of foreclosure was entered which ordered that the mortgaged property could be sold with the proceeds of such sale remitted to First Central. A public foreclosure sale was held at which no third-party buyers submitted bids for the mortgaged property. Thereafter, the property became an REO property which was held and offered for sale by First Central.

81. On May 5, 2008, the property was sold for $600,000 to an independent third-party. At the time of sale, the outstanding balance of the Baker mortgage loans was $1,599,994.46 plus $4,787.76 in expenses, totaling $1,604,782.22.

82. As such, a "clear and definite" loss of $1,004,782.22 exists which represents the deficiency amount that was unrecoverable through foreclosure.

### 3.    Rivky Rubenstein

83.    The Rubenstein mortgage loans were closed in April 2006 in the principal amounts of $280,000 and $56,250.00, and, upon information and belief, both loans defaulted immediately in June 2006.  The property securing the mortgage loan was located at 640 NE 177 Street, Miami, Florida.

84.    A judgment of foreclosure was entered which ordered that the mortgaged property could be sold.  A public foreclosure sale was held at which no third-party buyers submitted bids for the mortgaged property.  Thereafter, the property became an REO property which was held and offered for sale by First Central.

85.    In March 2008, the property was sold for $320,000 to an independent third-party.  At the time of sale, the outstanding balance of the Rubenstein mortgage loan was $337,500 plus $15,597.24 in expenses, totaling $353,097.24.

86.    As such, a "clear and definite" loss of $33,097.24 exists which represents the deficiency amount that was unrecoverable through foreclosure.

### 4.    Eliyahu Green

87.    In September 2004, First Central closed a mortgage loan for Green in the principal amount of $248,000.00 on 15 Cathedral Drive, Lakewood, New Jersey.

88.    Upon information and belief, the loan defaulted in June 2006, but the Meridian Defendants continued to make the required payments, even after the Meridian Defendants foreclosed on the mortgaged property in November 2006 without First Central's knowledge.

89.    In October 2007, First Central discovered that the property had been foreclosed and that it actually owned the mortgaged property as an REO.

29

90.   Thereafter, on March 19, 2008, the property was sold for $234,696.09. At the time of sale, the outstanding balance of the Green mortgage loan was $259,051.92.

91.   As such, a "clear and definite" loss of $24,355.83 exists which represents the deficiency amount that was unrecoverable through foreclosure.

5.   **Missiel Lugo**

92.   The Lugo mortgage loans were closed in March 2006 in the principal amounts of $209,000.00 and $59,800.00, and, upon information and belief, defaulted almost immediately in August 2006. The property securing the mortgage loan is located at 829 S. 15th Street, Newark, New Jersey.

93.   In February 2006, the Addison Group performed an appraisal which valued the mortgaged property at $300,000.00. However, a subsequent appraisal performed in April 2008 determined that the original appraisal made material omissions and misstatements of fact and that the actual value of the mortgaged property was $165,000 -- a significant overstatement of $135,000 or 45% in a reasonably short period of time.

94.   A judgment of foreclosure was entered which ordered that the mortgaged property could be sold with the proceeds of such sale remitted to First Central. A public foreclosure sale was held at which no third-party buyers submitted bids for the mortgaged property. Thereafter, the mortgaged property became REO property which was held and offered for sale by First Central.

95.   The current outstanding balance of the Lugo mortgage loans plus expenses is $273,730.10.

96.   To date, the mortgaged property remains unsold despite good faith efforts by First Central, and, as such, a "clear and definite" loss of $108,730.10 exists on the Lugo

mortgage loan. Such amount is based upon the outstanding loan amount minus the current appraised value of $165,000.

**6.** **Magdelena Fudali**

97. The mortgage loan for Fudali was closed in 2006 in the principal amount of $190,000.00, and was subsequently purchased by First Central in 2006. Upon information and belief, the Fudali loan defaulted almost immediately. The property securing the mortgage loan is located at 1525 Mantua Avenue, Coral Gables, Florida.

98. In July 2006, Solar performed an appraisal which valued the mortgaged property at $1,400,000. However, a subsequent appraisal performed in April 2008 determined that the original appraisal made material omissions and misstatements of fact and that the actual value of the mortgaged property was $780,000 -- a significant overstatement of $620,000 or 44% in a reasonably short period of time.

99. First Central's mortgage loan is in a secondary position to a $1,000,000 first loan held by Suncoast Mortgage. Upon information and belief, the Meridian Defendants initiated a foreclosure action on behalf of First Central without regard for the fact that Suncoast held a superior mortgage loan on the mortgaged property.

100. A judgment of foreclosure was entered which ordered that the mortgaged property could be sold. However, such sale was subject to the superior mortgage loan. A public foreclosure sale was held at which no third-party buyers submitted bids for the property. Thereafter, the property became an REO property which was held and offered for sale by First Central subject to Suncoast's $1,000,000 mortgage loan on the property.

101. Upon information and belief, Suncoast has initiated a foreclosure action to foreclose on its $1,000,000 loan.

102.  The current outstanding balance of the Fudali mortgage loan plus expenses is $190,473.55.

103.  To date, the mortgaged property remains unsold.  As demonstrated by the April 2008 appraisal, there is insufficient equity in the property for First Central to recover its $190,473.55 loss, especially in light of Suncoast's first position $1,000,000 mortgage loan.  As such, a "clear and definite" loss of $190,473.55 exists on the Lugo mortgage loan.

### 7.    Adam Jones (2 loans)

104.  First Central closed and purchased two mortgage loans for Jones in 2006: (1) a $322,500 first mortgage on Apartment 202 in 1745 James Street, South Beach, Florida, and (2) a $322,500 first mortgage on Apartment 203 in 1745 James Street, South Beach, Florida.  Upon information and belief, both loans defaulted in June 2007.

105.  First Central approved the purchase of the loans based in part on property appraisals by MDS in April 2006.  The appraisals -- which valued both apartments at $430,000 -- were submitted by the Meridian Defendants to First Central.

106.  A subsequent appraisal in May 2008 demonstrated that the original appraisals made material omissions and misstatements of fact and that the actual value of the properties was $170,000 -- a significant overstatement of $280,000 or 60% in a reasonably short period of time.

107.  A judgment of foreclosure was entered which ordered that the properties could be sold with the proceeds of such sale remitted to First Central.  A public foreclosure sale was held at which no third-party buyers submitted bids for the properties.  Thereafter, the properties became REO properties which were held by First Central.

108. In July 2008, the property located at 1745 James Street, South Beach, Florida, Apartment 202 was sold for $178,335. The outstanding balance of the Jones' loan plus expenses on Apartment 202 was $339,729.83. As such, a "clear and definite" loss of $161,394.83 exists which represents the deficiency amount that was unrecoverable through foreclosure.

109. In September 2008, the property located at 1745 James Street, South Beach, Florida, Apartment 203 was sold for sold for $177,420. The outstanding balance of the Jones' mortgage loan on Apartment 203 was $322,500 plus $18,589.48 in expenses, totaling $341,089.48. As such, a "clear and definite" loss of $163,669.48 exists which represents the deficiency amount that was unrecoverable through foreclosure.

## G.   The RICO Defendants' Criminal Enterprise

110. The RICO Defendants collectively constitute an "enterprise" and are members of an "enterprise" within the meaning of 18 U.S.C. § 1961(4)  in that they are an association in fact and who routinely do business with each other through both legitimate and illegitimate arrangements.

111. Each of the RICO Defendants has an independent existence beyond their conduct to defraud First Central, including acting as a mortgage broker, maintaining law practices and conducting legitimate appraisals on properties, and, upon information and belief, have acted together at times to provide non-fraudulent loans.

112. The Meridian Defendants controlled and/or managed this association-in-fact by, *inter alia*, (1) selecting and utilizing the Attorney Defendants and Appraiser Defendants with respect to their respective services on the Non-Performing Loans, (2) coordinating and arranging the activities of the Attorney Defendants and Appraiser

33

Defendants, including, *inter alia*, the submission of the fraudulent appraisals and other loan documents in connection with the fraudulent acts perpetrated on First Central, (3) serving as a point of contact for communications for the RICO Defendants with First Central, and (4) taking actions to intentionally conceal the fraud of the RICO Defendants from First Central.

113. The Attorney Defendants and the Appraisal Defendants were essential components to the Meridian Defendants' scheme to defraud First Central. Each provided services in the scheme which were required for the scheme to succeed, including providing fraudulent appraisals and closing loans with false or defective documents and information. Without such involvement, the scheme could not have been completed by the Meridian Defendants.

114. The RICO Defendants were consistently involved in a high percentage of the Non-Performing Loans. In fact, MDS and NH Appraisals prepared appraisals for approximately 37% of the Non-Performing Loans.

115. From 2003 through 2008, the RICO Defendants engaged in a pattern of continuous racketeering with respect to their efforts to defraud First Central. The RICO Defendants engaged in such conduct for the purpose of collecting significant fees and commissions to the detriment of First Central.

116. The RICO Defendants directly or indirectly invested in, maintained an interest in, or participated in the enterprise.

117. The enterprise and the racketeering activities of the RICO Defendants directly affected interstate commerce.

118. The RICO Defendants' predicate acts of mail fraud, wire fraud, and bank fraud constitute "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

119.  The actions of the RICO Defendants constitute a pattern of activity with respect to their efforts to defraud First Central, and have the same purposes, results, participants, victim, and method of commission.  Specifically, the RICO Defendants actions: (1) have the purpose of defrauding First Central by providing fraudulent information and documents to First Central, (2) have induced First Central into funding and/or purchasing mortgage loans based upon such fraudulent information, (3) have the same victim, namely, First Central, and (4) utilize the same method of fraud for each attempt to defraud First Central.

120.  As a direct and proximate cause of the RICO Defendants' continuing pattern of racketeering, First Central funded and/or purchased the Non-Performing Loans based on the reasonable belief that the information and loan documentation submitted by the RICO Defendants did not contain fraudulent information.

**COUNT I**

**(Violation of The Federal Racketeer Influenced and Corrupt
Organization Act, 18 U.S.C. § 1962(c) – Against All Defendants)**

121.  Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 120 as if fully set forth herein.

122.  The RICO Defendants collectively constitute an "enterprise" and are members of an "enterprise" within the meaning of 18 U.S.C. § 1961(4) in that they are an association in fact and who routinely do business with each other through both legitimate and illegitimate arrangements.

123.  As set forth above, the Meridian Defendants controlled and/or managed this association-in-fact.

124.  The RICO Defendants committed a continuing series of schemes or artifices to defraud First Central by causing it to fund and/or purchase the Non-Performing

35

Loans based on fraudulently inflated appraisals, fraudulent loan documents and information, and loan documents that intentionally omitted necessary information to protect First Central's interests.

125. The RICO Defendants submitted the documents and information containing these misrepresentations and omissions to each other and First Central through the United States mail, private or commercial interstate carriers, facsimile over telephone wires, and the internet.

126. Specifically, between 2003 and 2008, the RICO Defendants continuously transmitted fraudulent documents and information to First Central with respect to the Non-Performing Loans, including, *inter alia*, loan applications, customer credit information, appraisals, loan documents, and HUD-1 Statements which were transmitted to First Central through the United States mail, private or commercial interstate carriers, facsimile over telephone wires, and the internet.

127. In reliance on these mail and wire frauds, First Central funded and/or purchased the Non-Performing Loans.

128. Furthermore, the RICO Defendants engaged in acts of bank fraud by using fraudulent means to defraud First Central into funding and/or purchasing the Non-Performing Loans, and by obtaining funds from First Central through the use of such fraudulent means.

129. The RICO Defendants' predicate acts of mail fraud (indictable under 18 U.S.C. § 1341) and bank fraud (indictable under 18 U.S.C. § 1343) constitute racketeering activity within the meaning of 18 U.S.C. § 1961(1), and collectively constitute a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

130. These predicate acts caused "clear and definite" damages and losses to First Central, and deprived First Central of its property interests in the Non-Performing Loans.

131. As a direct and proximate cause of the RICO Defendants' continuing pattern of racketeering activity, First Central funded and/or purchased the Non-Performing Loans.

132. As a direct and proximate cause of the RICO Defendants' continuing pattern of racketeering activity, First Central has suffered "clear and definite" injury to its business in the amount of $2,006,962.16, as set forth above in ¶¶ 71-109.

133. Furthermore, as a direct and proximate cause of the RICO Defendants' continuing pattern of racketeering activity: (1) the Non-Performing Loan values have been substantially diminished; and (2) the Non-Performing Loan values are insufficient to satisfy the outstanding loan balances, thereby causing First Central to incur the expense of owning, servicing, and disposing of the defaulted properties until the time that they can be sold for an amount which is substantially less than the loan amounts.

## COUNT II

### (Conspiracy to Violate The Federal Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1962(d) – Against All Defendants)

134. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 133 as if fully set forth herein.

135. The RICO Defendants conspired with and amongst themselves and other to violate the provisions of 18 U.S.C. § 1962(c), and that conspiracy violated 18 U.S.C. § 1962(d).

37

136. As a direct and proximate cause of the RICO Defendants' unlawful conduct, First Central has suffered "clear and definite" injury to its business in the amount of $2,006,962.16, as set forth above in ¶¶ 71-109.

137. As a direct and proximate cause of the RICO Defendants' conspiracy, First Central has suffered and will continue to suffer actual and consequential damages in that: (1) eight of the Non-Performing Loans have been foreclosed and have either been sold, or have attempted to be sold in good faith for less than the value of the loans, causing significant deficiency losses to First Central; (2) the Non-Performing Loan values have been substantially diminished; and (3) the Non-Performing Loan values are insufficient to satisfy the outstanding loan balances, thereby causing First Central to incur the expense of owning, servicing and disposing of the defaulted properties until the time that they can be sold for an amount which is substantially less than the loan amounts.

## COUNT III
## (Fraud – Against All Defendants)

138. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 137 as if fully set forth herein.

139. The RICO Defendants made repeated factual misrepresentations to First Central. First, the Meridian Defendants consistently submitted fraudulent documentation and information to First Central relating to the financial condition of potential borrowers. The Meridian Defendants knew that such documents and information were fraudulent when they submitted it to First Central.

140. Second, the Meridian Defendants and the Appraiser Defendants consistently prepared and submitted fraudulent appraisals that significantly overstated the values of properties for the Non-Performing Loans. The Meridian Defendants and the

Appraiser Defendants knew that these appraisals were fraudulent when they submitted them to First Central.

141. Third, the Meridian Defendants and the Attorney Defendants consistently permitted mortgage loans to close that had loan documents which intentionally omitted necessary terms that inured to the benefit of First Central, and which failed to meet the closing requirements of First Central. Specifically, a majority of the Non-Performing Loans had commitment letters issued by First Central explicitly provided that the adjustable interest rate the borrower was required to pay contained an interest rate floor. However, the Meridian Defendants and the Attorney Defendants intentionally permitted these loans to close without interest rate floors.

142. Fourth, the Meridian Defendants and the Attorney Defendants consistently permitted mortgage loans to close with funding by First Central despite the fact that they had knowledge of facts that adversely affected the borrower's ability to meet his or her obligations, the value of the collateral, and First Central's interests with respect to the loans.

143. The RICO Defendants' misrepresentations were made with the intent to deceive First Central.

144. At all times, the RICO Defendants knew or should have known that First Central would rely upon their misrepresentations to its detriment.

145. First Central relied upon the false representations to its detriment.

146. As a direct and proximate cause of the RICO Defendants' actions, First Central has suffered and will continue to suffer actual and consequential damages in that: (1) eight of the Non-Performing Loans have been foreclosed and have either been sold, or have attempted to be sold in good faith for less than the value of the mortgage loans, causing

significant deficiency losses to First Central; (2) the Non-Performing Loan values have been substantially diminished; and (3) the Non-Performing Loan values are insufficient to satisfy the outstanding loan balances, thereby causing First Central to incur the expense of owning, servicing and disposing of the defaulted properties until the time that they can be sold for an amount which is substantially less than the loan amounts.

147. Due to the RICO Defendants' fraudulent conduct, First Central has been damaged in an amount not less than $16,000,000, to be determined at trial.

## COUNT IV
### (Conspiracy to Defraud – Against All Defendants)

148. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 147 as if fully set forth herein.

149. The RICO Defendants combined and entered into an agreement or agreements to accomplish the funding and/or sale of the Non-Performing Loans by the use of fraudulent and unlawful means.

150. The RICO Defendants committed a continuing series of schemes or artifices to defraud First Central by causing it to fund and/or purchase the Non-Performing Loans based on fraudulently inflated appraisals, fraudulent loan documents and information, and loan documents that intentionally omitted necessary information to protect First Central's interests.

151. The RICO Defendants controlled, managed, supervised, authorized, sanctioned, recommended, ordered, participated in, and/or knew or reasonably should have known of these overt acts in furtherance of the conspiracy.

152. As a direct and proximate cause of the civil conspiracy, First Central entered into the subject mortgage loan transactions.

153. As a direct and proximate cause of the conspiracy, First Central has suffered and will continue to suffer actual and consequential damages, including, *inter alia*, (1) eight of the Non-Performing Loans have been foreclosed and have either been sold, or have attempted to be sold in good faith for less than the value of the loans, causing significant deficiency losses to First Central; (2) the Non-Performing Loan values have been substantially diminished; and (3) the Non-Performing Loan values are insufficient to satisfy the outstanding loan balances, thereby causing First Central to incur the expense of owning, servicing and disposing of the defaulted properties until the time that they can be sold for an amount which is substantially less than the loan amounts.

154. Due to the foregoing, First Central has been damaged in an amount not less than $16,000,000, to be determined at trial.

## COUNT V
### (Breach of Fiduciary Duty – Against All Defendants)

155. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 154 as if fully set forth herein.

156. The Meridian Defendants had a fiduciary relationship with First Central that arose from the parties' business relationships, as well as from the Loan Origination Agreement and the Loan Purchase Agreements. In this regard, the Meridian Defendants promised and assured First Central that, as the mortgage broker for the subject mortgage loans, they would represent First Central's interests and that all aspects of any mortgage loans submitted to First Central, including appraisals, would be legitimate and free from fraud. Further, First Central relied upon the Meridian Defendants to act as an intermediary with its borrowers.

157. As such, First Central placed a special trust and confidence in the Meridian Defendants which was knowingly accepted by the Meridian Defendants.

158. Moreover, the Attorney Defendants and the Appraiser Defendants had a fiduciary relationship with First Central based upon their retention to act as First Central's agents with respect to the origination and closing of the Non-Performing Loans.

159. The RICO Defendants made repeated factual misrepresentations to First Central that included the submission of documents, information and appraisals which were fraudulent.

160. The Meridian Defendants, the Appraiser Defendants and the Attorney Defendants all breached their fiduciary duties to First Central by engaging in the conduct described above.

161. As a direct and proximate cause of such unlawful conduct, First Central has suffered, and will continue to suffer actual and consequential damages in an amount not less than $16,000,000, to be determined at trial.

## COUNT VI
### (Negligent Misrepresentation – Against All Defendants)

162. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 161 as if fully set forth herein.

163. The Meridian Defendants had a special or fiduciary relationship with First Central that arose from the parties' business relationships, as well as from the Loan Origination Agreement and the Loan Purchase Agreements.

164. The Meridian Defendants promised and assured First Central that, as the mortgage broker for the subject mortgage loans, they would represent First Central's interests and that all aspects of any mortgage loans submitted to First Central, including appraisals,

would be legitimate and free from fraud. Further, First Central relied upon the Meridian Defendants to act as an intermediary with its borrowers.

165. Moreover, the Attorney Defendants and the Appraiser Defendants had a fiduciary relationship with First Central based upon their retention to act as First Central's agents with respect to the origination and closing of the Non-Performing Loans.

166. The RICO Defendants made repeated factual misrepresentations to First Central that included the submission of documents, information and appraisals which were fraudulent.

167. The RICO Defendants knew or reasonably should have known the falsity of these misrepresentations.

168. The RICO Defendants each owed a duty of care not to communicate false information to First Central in connection with the Non-Performing Loans.

169. The RICO Defendants failed to exercise reasonable care in communicating false information to First Central.

170. First Central relied upon the false representations to its detriment.

171. As a direct and proximate cause of the material representations made by the RICO Defendants, First Central funded and/or purchased the Non-Performing Loans.

172. As a direct and proximate cause of the RICO Defendants' misrepresentations, First Central has suffered, and will continue to suffer actual and consequential damages in an amount not less than $16,000,000, to be determined at trial.

## COUNT VII
### (Breach of the Loan Origination Agreement – Against the Meridian Defendants)

173. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 172 as if fully set forth herein.

43

174. First Central and the Meridian Defendants entered into the Loan Origination Agreement with the express intention that the Meridian Defendants would either sell or purchase the mortgage loans originated under the agreement within 90 days of the date of the closing for each mortgage loan.

175. The Loan Origination Agreement was a valid and binding agreement between First Central and the Meridian Defendants.

176. Pursuant to the Loan Origination Agreement, the Meridian Defendants had an obligation to sell or purchase the mortgage loans originated under the agreement within 90 days of the date of closing for each mortgage loan.

177. First Central and the Meridian Defendants originated mortgage loans pursuant to the Loan Origination Agreement which were not purchased by the Meridian Defendants within 90 days of the closing of each respective mortgage loan. As such, the Meridian Defendants are in breach of the Loan Origination Agreement.

178. The Meridian Defendants' fraudulent conduct with respect to the Non-Performing Loans also constitutes a breach of the duty of good faith and fair dealing that is implied in the Loan Origination Agreement.

179. As a result of the Meridian Defendants' breach of the Loan Origination Agreement, First Central has been damaged in an amount to be determined at trial.

## COUNT VIII
### (Breach of the Loan Purchase Agreements – Against the Meridian Defendants)

180. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 179 as if fully set forth herein.

181. First Central and the Meridian Defendants entered into the Loan Purchase Agreements with the express intention that the Meridian Defendants would either sell or

44

purchase the mortgage loans purchased under the agreement within 90 days of the date of the purchase of each mortgage loan.

182. The Loan Purchase Agreements were valid and binding agreements between First Central and the Meridian Defendants.

183. Pursuant to the Loan Purchase Agreements, the Meridian Defendants had an obligation to purchase the mortgage loans originated under the agreement within 90 days of the date of closing for each mortgage loan.

184. The Loan Purchase Agreements also provided that First Central would be entitled to liquidated damages which would yield First Central a return of 17.5% per annum for the period of default in the event that the Meridian Defendants failed to repurchase the loans within 90 days

185. The Loan Purchase Agreements also provided that the Meridian Defendants had an obligation to ensure that the Meridian Defendants had no actual knowledge of any false information being provided to First Central.

186. Beginning in January, 2003, First Central purchased Purchase Pool Loans from the Meridian Defendants pursuant to the Loan Purchase Agreements.

187. At all times, First Central complied with its obligations under each of the Loan Purchase Agreements.

188. The Meridian Defendants have breached the Loan Purchase Agreements because they have failed to repurchase a significant portion of the Purchase Pool Loans within 90 days of the date of each Loan Purchase Agreement.  Rather, the Purchase Pool Loans are still held by First Central.

189. The Meridian Defendants have also breached the Loan Purchase Agreements by, *inter alia*, (a) submitting documents to First Central that were not genuine; and (2) by providing fraudulent information to First Central.

190. As a result of the Meridian Defendants' breaches of the Loan Purchase Agreements, First Central has suffered damages in an amount to be determined at trial.

## COUNT IX
## (Breach of the Guarantee Agreement by Brecher)

191. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 190 as if fully set forth herein.

192. On March 18, 2003, as part of the Loan Origination Agreement, Brecher personally guaranteed the obligations of MSI and Meridian under the Agreement, including the obligation to sell or purchase the mortgage loans originated under the agreement within 90 days after the closing of the mortgage loans (the "Guaranty Agreement"). *See*, Ex. A, § 4.1(c).

193. The Guaranty Agreement is a valid and binding agreement between First Central and Brecher.

194. As set forth above, First Central and the Meridian Defendants originated mortgage loans pursuant to the Loan Origination Agreement which were not sold or purchased by the Meridian Defendants within 90 days of the closing of each respective mortgage loan.

195. As such, Brecher was personally obligated to purchase the mortgage loans originated under the Loan Origination Agreement.

196. Brecher has not complied with his obligations under the Guaranty Agreement.

197. As a result of the forgoing, First Central has been damaged in an amount to be determined at trial.

46

## COUNT X
### (Specific Performance – Against the Meridian Defendants)

198. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 197 as if fully set forth herein.

199. The Loan Origination Agreement and the Loan Purchase Agreements are valid agreements between First Central and the Meridian Defendants.

200. The Loan Origination Agreement and the Loan Purchase Agreements each require the Meridian Defendants to either sell or purchase the mortgage loans originated and/or purchased under the agreements within 90 days of the date of the closing and/or sale of each mortgage loan.

201. First Central has performed all of its obligations under the Loan Origination Agreement and the Loan Purchase Agreements.

202. The Meridian Defendants have failed to comply with their obligations under the Loan Origination Agreement and the Loan Purchase Agreements.

203. Upon information and belief, the Meridian Defendants are able to comply with their repurchase obligations under the Loan Origination Agreement and the Loan Purchase Agreements.

204. First Central has no adequate remedy at law.

205. As such, First Central seeks an Order from this Court directing the Meridian Defendants to comply with their obligations under the Loan Origination Agreement and Loan Purchase Agreements by selling or purchasing the Non-Performing Loans originated and/or purchased pursuant to the Loan Origination Agreement and Loan Purchase Agreements.

## COUNT XI
### (Unjust Enrichment – Against All Defendants)

206. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 205 as if fully set forth herein.

207. The RICO Defendants have benefited from and have been unjustly enriched by their unlawful and improper actions with respect to the Non-Performing Loans.

208. The RICO Defendants' unjust enrichment has come at First Central's expense and to First Central's detriment, and, as such, First Central has suffered damages in an amount to be determined at trial.

## COUNT XII
### (Conversion – Against All Defendants)

209. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 208 as if fully set forth herein.

210. By virtue of the RICO Defendants' fraudulent actions detailed above, the RICO Defendants have willfully and wrongfully misappropriated and converted First Central's funds into their own property, including, *inter alia*, fees collected on loans procured through fraud, origination fees collected on loans procured through fraud, improper professional fees, and profits obtained through the sale of mortgage loans in the secondary market.

211. The RICO Defendants do not have any legal entitlement to these monies.

212. As a result of the RICO Defendants' wrongful misappropriation and conversion, First Central has suffered, and continues to suffer, damages in an amount to be determined at trial.

48

## COUNT XIII

### (Attorney Malpractice – Against the Attorney Defendants)

213. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 212 as if fully set forth herein.

214. As legal counsel to First Central with respect to the origination and closing of the Non-Performing Loans, the Attorney Defendants each owed First Central a duty to exercise the skill and knowledge ordinarily possessed by a member of the legal profession experienced in such matters and to exercise reasonable care, prudence and diligence in the performance of their professional obligations.

215. As counsel to First Central, the Attorney Defendants also owed First Central a duty of utmost good faith and undivided loyalty.

216. First Central relied on the purported expertise of the Attorney Defendants in connection with the origination and closing of the subject mortgage loans.

217. The Attorney Defendants breached each of their respective duties to First Central by consistently permitting mortgage loans to close that had loan documents which intentionally omitted necessary terms that inured to the benefit of First Central, and which failed to meet the closing requirements of First Central. Specifically, a majority of the Non-Performing Loans had commitment letters issued by First Central which contained interest rate floors. However, the Attorney Defendants intentionally permitted these loans to close without interest rate floors so that borrowers would be induced to close the mortgage loans with First Central.

218. Moreover, the Attorney Defendants consistently permitted mortgage loans to close with funding by First Central despite the fact that they had knowledge of facts that

adversely affected the borrowers' ability to perform their obligations, the value of the collateral, and First Central's interests with respect to the loans.

219. As a direct and proximate result of the negligence and malpractice of the Attorney Defendants, First Central has suffered damages in an amount to be determined at trial.

**COUNT XIV**

**(Professional Malpractice – Against the Appraiser Defendants)**

220. Plaintiff repeats and realleges each of the allegations contained in paragraphs 1 through 219 as if fully set forth herein.

221. As real estate appraisers acting on behalf of First Central with respect to the preparation and submission of real estate appraisals for the Non-Performing Loans, the Appraiser Defendants each owed First Central a duty to exercise the skill and knowledge ordinarily possessed by a member of the appraisal profession experienced in such matters and to exercise reasonable care, prudence and diligence in the performance of their professional obligations.

222. First Central relied on the purported expertise of the Appraiser Defendants with respect to the preparation and submission of the real estate appraisals for the Non-Performing Loans.

223. The Appraiser Defendants each breached their respective duties by consistently preparing and submitting real estate appraisals for the Non-Performing Loans which contained misstatements and omissions and which substantially overstated the value of the subject properties.

224. As a direct and proximate result of the negligence and malpractice of the Appraiser Defendants, First Central has suffered damages in an amount to be determined at trial.

## DEMAND FOR JURY TRIAL

225. Plaintiff demands a trial by jury as to all issues so triable.

**WHEREFORE**, Plaintiff demands judgment as follows:

A.   On Count One, (1) awarding First Central compensatory and consequential damages, in an amount not less than $2,006,962.16, to be determined at trial; (2) treble damages, reasonable attorney's fees, expenses and costs pursuant to 18 U.S.C. § 1964(c); (3) pre-judgment and post-judgment interest; (4) punitive damages; and (5) such other further relief as the Court deems just and proper.

B.   On Count Two, (1) awarding First Central compensatory and consequential damages, in an amount not less than $2,006,962.16, to be determined at trial; (2) treble damages, reasonable attorney's fees, expenses and costs pursuant to 18 U.S.C. § 1964(c); (3) pre-judgment and post-judgment interest; (4) punitive damages; and (5) such other further relief as the Court deems just and proper.

C.   On Count Three, (1) awarding First Central compensatory and consequential damages, in an amount not less than $16,000,000, to be determined at trial; (2) reasonable attorneys' fees and costs; (3) pre-judgment and post-judgment interest; (4) punitive damages; and (5) such other further relief as the Court deems just and proper.

D.   On Count Four, (1) awarding First Central compensatory and consequential damages, in an amount not less than $16,000,000, to be determined at trial; (2)

51

reasonable attorneys' fees and costs; (3) pre-judgment and post-judgment interest; (4) punitive damages; and (5) such other further relief as the Court deems just and proper.

      E.    On Count Five, (1) awarding First Central compensatory and consequential damages, in an amount not less than $16,000,000, to be determined at trial; (2) reasonable attorneys' fees and costs; (3) pre-judgment and post-judgment interest; (4) punitive damages; and (5) such other further relief as the Court deems just and proper.

      F.    On Count Six, (1) awarding First Central compensatory and consequential damages, in an amount not less than $16,000,000, to be determined at trial; (2) reasonable attorneys' fees and costs; (3) pre-judgment and post-judgment interest; (4) punitive damages; and (5) such other further relief as the Court deems just and proper.

      G.    On Count Seven, (1) awarding First Central compensatory and consequential damages, in an amount to be determined at trial; (2) reasonable attorneys' fees and costs; (3) pre-judgment and post-judgment interest; (4) punitive damages; and (5) such other further relief as the Court deems just and proper.

      H.    On Count Eight, (1) awarding First Central compensatory and consequential damages, in an amount to be determined at trial; (2) reasonable attorneys' fees and costs; (3) pre-judgment and post-judgment interest; (4) punitive damages; and (5) such other further relief as the Court deems just and proper.

      I.    On Count Nine, (1) awarding First Central compensatory and consequential damages, in an amount to be determined at trial; (2) reasonable attorneys' fees and costs; (3) pre-judgment and post-judgment interest; (4) punitive damages; and (5) such other further relief as the Court deems just and proper.

J.      On Count Ten, (1) directing the Meridian Defendants to comply with their obligations under the Loan Origination Agreement and Loan Purchase Agreements by selling or purchasing the Non-Performing Loans originated and/or purchased pursuant to the Loan Origination Agreement and Loan Purchase Agreements; and (2) such other further relief as the Court deems just and proper.

K.      On Count Eleven, (1) awarding First Central compensatory and consequential damages, in an amount to be determined at trial; (2) reasonable attorneys' fees and costs; (3) pre-judgment and post-judgment interest; (4) punitive damages; and (5) such other further relief as the Court deems just and proper.

L.      On Count Twelve, (1) awarding First Central compensatory and consequential damages, in an amount to be determined at trial; (2) reasonable attorneys' fees and costs; (3) pre-judgment and post-judgment interest; (4) punitive damages; and (5) such other further relief as the Court deems just and proper.

M.      On Count Thirteen, (1) awarding First Central compensatory and consequential damages, in an amount to be determined at trial; (2) reasonable attorneys' fees and costs; (3) pre-judgment and post-judgment interest; (4) punitive damages; and (5) such other further relief as the Court deems just and proper.

N.      On Count Fourteen, (1) awarding First Central compensatory and consequential damages, in an amount to be determined at trial; (2) reasonable attorneys' fees and costs; (3) pre-judgment and post-judgment interest; (4) punitive damages; and (5) such other further relief as the Court deems just and proper.

O.     Awarding First Central any such other and additional relief as the Court

deems just and proper.

Dated: New York, New York
        August 7, 2009

**Todtman, Nachamie, Spizz & Johns, P.C.**

Joseph P. Cervini, Jr. (JC 6143)
425 Park Avenue
New York, New York 10022
212-754-9400
*Attorneys for Plaintiff*
*First Central Savings Bank*

54